## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | |
| PAMELA J. WELLINGTON, | * | Chapter 13 |
| Debtor | * | |
| | * | Case No.: 1-05-bk-04930 |
| TERESA A. SCOTT, | * | |
| SAIDIS, SHUFF, FLOWER & | * | |
| LINDSAY, | * | |
| Objectants | * | |
| | * | |
| v. | * | Objections to plan |
| | * | Motion to dismiss case |
| PAMELA J. WELLINGTON, | * | Objection to fees |
| Respondent | * | |
| | * | |
| MICHAEL TRAVIS, ESQUIRE, | * | |
| Movant | * | |
| | * | |
| v. | * | |
| | * | |
| TERESA A. SCOTT, | * | |
| Objectant | * | |

## OPINION

Four matters currently before the Court in the above-captioned bankruptcy case will be

addressed in this Opinion – the objections that were filed by Saidis, Shuff, Flower & Lindsay

("SSF&L") and Teresa Scott ("Scott") to the chapter 13 plan of Pamela J. Wellington

("Debtor"), the motion filed by Scott to dismiss Debtor's case, and the objection filed by Scott to

the fee application filed on December 13, 2005 and amended December 14, 2005 (Docket # 45 &

# 46) of Debtor's counsel, Michael Travis, Esquire ("Travis").

1

## **Procedural History**

On July 27, 2005, Debtor filed the instant chapter 13 petition. Her schedules included no secured or priority claims, but listed unsecured, nonpriority claims totaling $63,098.35. Creditors holding unsecured claims included SSF&L, Debtor's former counsel, which had a claim of $32,896.35 for services rendered in defending a civil lawsuit filed in district court by Scott, who also was listed as an unsecured, nonpriority creditor. Scott's claim was listed as contingent, unliquidated and disputed.

Debtor's schedule "I" reported monthly income of $2,635.00 and schedule "J" reported monthly expenses of $2,217.00. In her chapter 13 plan, Debtor proposes to pay to the trustee the sum of $300.00 per month for thirty-six months ($10,800.00) for distribution under the plan. Alleging that $300.00 per month did not represent all of Debtor's disposable income, Scott and SSF&L filed objections to Debtor's chapter 13 plan. A hearing on these objections was held on November 16, 2005 ("the November hearing"), and the matter is ready for decision.

On December 14, 2005, Travis filed an amended motion for payment of attorneys fees pre-confirmation. This motion sought $1,810.25 in fees and costs to be paid as an administrative expense from Debtor's chapter 13 plan. Scott filed a timely objection to the motion, and a hearing was held on January 10, 2006 ("the January hearing"). This matter is ready for decision.

On February 10, 2006, Scott filed a motion to dismiss Debtor's case or, in the alternative, to convert it to one under chapter 7. On March 3, 2006, Debtor filed an answer to the motion to

dismiss. A hearing on this motion was held on April 20, 2006 ("the April hearing"). This matter also is ready for decision.[1]

## Factual Findings

On September 9, 2002, Scott filed a civil action for defamation against Debtor and another party in the United States District Court for the Middle District of Pennsylvania. Debtor retained SSF&L as defense counsel, who billed Debtor for approximately $35,000.00 in legal fees for services rendered in connection with the suit. After Debtor filed the instant petition, the case was closed by the District Court for statistical purposes pending resolution of the bankruptcy case. At the outset of the litigation, the co-defendant paid approximately $3,500.00 toward Debtor's legal expenses. In June 2003, Debtor signed a letter agreement with SSF&L agreeing to pay $100.00 per month to reduce her outstanding legal fees, which at the time totaled $1,793.70. Debtor made these monthly payments to SSF&L in a timely manner until December 2004, when SSF&L's managing partner contacted Debtor and requested that she sign a judgment note in the amount of $31,784.85 – the amount of the unpaid, outstanding fees. When Debtor refused to sign the note, SSF&L moved to withdraw as counsel. Over Debtor's objection, SSF&L's motion was granted by the District Court. The defamation suit was set to go to trial in September 2005, but the filing of Debtor's petition stayed the proceeding.

---

[1]I have jurisdiction over all of these matters pursuant to 28 U.S.C. §§ 157 and 1334. The objection to plan is a core matter pursuant to 28 U.S.C. § 157(b)(2)(L). The motion to dismiss is a core matter pursuant to 28 U.S.C. §157(b)(2)(A) and (O). The fee objection is a core matter pursuant to 28 U.S.C. § 157(b)(2)(C). This Opinion constitutes the findings of fact and conclusions of law under Fed. R. Bankr. P. 7052, which is made applicable to contested matters under Fed. R. Bankr. P. 9014©).

3

Debtor's financial struggles began after her divorce in 2001. She has one child, a son who was 19 years of age on the date of the April 2006 hearing and who has lived with her on and off since she filed her case. At the time of the November 2005 hearing, Debtor's son was employed part time as a pizza delivery person, but he was scheduled to begin classes at Shippensburg University in the spring 2006 semester.

Debtor is employed as an art teacher by the South Middleton School District ("SMSD"), Cumberland County, Pennsylvania. Her annual salary for the 2005/2006 school year was approximately $45,400.00. She receives periodic salary increases, the timing and amount of which vary according to the labor contract then in force. In the past several school years, she has obtained three "extra duty" contracts with SMSD, which increased her gross income by approximately $2,800.00 per year. Debtor's schedule "I" states that she receives gross monthly pay of $3,698.76 from her teaching position. After subtracting mandatory deductions, Debtor's net monthly income from her salary is reported at $2,543.59. In addition to her salary, Debtor also reported "extra duty" income of $91.66 per month and total net monthly income of $2635.25.[2] Debtor also tries, with limited success, to augment her income by selling her paintings. She has over 50 paintings in her collection, which she advertises for sale at local art galleries and on the Internet. She has sold one painting in the last two years.[3] The sale price of

---

[2]Debtor introduced a pay stub from July 2005, the month in which she filed her petition, showing a bi-weekly net income of $1,117.06. Debtor testified that she calculated her income on schedule "I" based on this pay stub, and then factored in an additional $91.66 per month based on her extra-duty contracts. Using this calculation, Debtor's net monthly income would be only $2,511.95. For purposes of the instant Opinion, however, the Court accepts information included on schedule "I" ($2,635.25) as reporting the correct amount of Debtor's monthly income on the date the schedules were filed.

[3]The sale occurred post-petition, in or around December 2005.

4

this painting is not of record, but other paintings in her collection are priced between $400.00 and $1,000.00.

When her son attained the age of 18 in October 2004, Debtor's ex-husband no longer was obligated to make child support payment. However, he continued to make support contributions on a voluntary basis until October 2005. Debtor deposited these payments into her bank account and used them to defray household expenses. At the November hearing, Debtor was questioned about whether these payments should have been reported on schedule "I" as income. Debtor countered that the payments went entirely for her son's college-related expenses and not for her personal use. Debtor later admitted that her son was not attending college in 2005. Debtor explained that she reported these payments on schedule "I," but did not include them in calculating her total monthly household income, because they were being made voluntarily by her ex-husband, and could not be compelled in the future.

On April 6, 2005, Debtor purchased certain musical equipment for her son that she charged on one of her credit cards. She did not report the $1,169.62 purchase on her Statement of Financial Affairs ("SOFA"), which requires the reporting of any charitable contribution or gift of over $200.00 made within the one year preceding the bankruptcy. Debtor stated that she did not consider this purchase to be a gift, but rather the necessary expenses of her son as her dependent.

At the November hearing, Debtor stated that the $91.66 per month reported in schedule "I" was a summary of her three extra duty contracts, and that she did not deduct from this figure the amount withheld for taxes. Debtor later admitted at the hearing that the reported amount of $91.66 represented her net monthly income from only one of the three extra duty contracts. She

5

testified that the net monthly income from the remaining two contracts was approximately $50.00. Debtor's extra duty contracts are awarded in each new school year. As of the date of her petition, Debtor had not yet been awarded any extra duty contracts for the 2005-06 school year.

On or about May 10, 2005, Debtor repaid a loan of $1,300.00 that she had received from a friend to help her purchase a used car for her son. Debtor failed to report this payment on her SOFA which requires reporting of all payments aggregating more than $600 to any single lender made within ninety (90) days of the petition. On advice of counsel, Debtor did not amend her SOFA to reflect this payment.

In the eight months immediately preceding the filing of her bankruptcy, Debtor's credit card purchases totaled $5,203.00. Debtor's total minimum payments on her credit cards in July 2005 were $490.00. As of July 2005, Debtor was also required to make a monthly payment of $100.00 to SSF&L. At no time in 2005 did Debtor fail to make a minimum payment on her credit cards or a timely payment to SSF&L. Debtor deposited $3,451.35 into her savings account between January and June 2005.

Between July 29, 2005 and December 13, 2005, Travis performed various services for Debtor related to the objections to confirmation as well as to a motion for relief from stay filed by Scott and a motion filed by Debtor for a protective order in the District Court suit. Travis's time was billed at $120.00 per substantive hour and $60.00 per travel hour. His paralegal's time was billed at $40.00 per hour. These rates are well within the limits of rates charged by comparably skilled practitioners in the Middle District of Pennsylvania for similar services and are similar to the rates Travis charges to other clients.

6

7

<u>**Discussion**</u>

This Discussion will address each of the captioned motions and objections *seriatim*.

**I.  The motion to dismiss.**

On request of a party in interest, a chapter 13 bankruptcy case may be dismissed "for cause."  11 U.S.C. §1307©).  Scott asserts that Debtor's case should be dismissed because it was not filed in good faith.  Although good faith is not explicitly mentioned in the Code, the Court of Appeals for the Third Circuit recognizes the absence of good faith or presence of bad faith as grounds for dismissal.  *In re Lilley*, 91 F.3d 491 (3rd Cir. 1996).  However, "good faith is a term incapable of precise definition. [T]he good faith inquiry is a fact intensive determination . . . left to the discretion of the bankruptcy court. [T]herefore, . . . the good faith of Chapter 13 filings must be assessed on a case-by-case basis in light of the totality of the circumstances."  *Lilley*, 91 F.3d at 496.

The "totality of the circumstances" test is comprised of a nonexclusive list of factors which include:

(1)  the nature of the debt;

(2)  the timing of the petition;

(3)  how the debt arose;

(4)  the debtor's motive in filing the petition;

(5)  how the debtor's actions affected creditors;

(6)  the debtor's treatment of creditors both before and after the petition was filed; and

8

(7)  whether the debtor has been forthcoming with the bankruptcy court and the creditors.

*Id*. (citations omitted.).  In order to ascertain whether, under the totality of the circumstances, Debtor's petition was filed in bad faith, the Court must apply the *Lilley* factors to the facts submitted in evidence.  *New Jersey Lawyers' Fund for Client Protection v. Goddard (In re Goddard)*, 212 B.R. 233 (D. N.J. 1997).  A finding that the petition was not filed in good faith must be demonstrated by the preponderance of the evidence.  *In re Dicey,* 312 B.R. 456 (Bankr. D. N.H. 2004); *In re Duruji*, 287 B.R. 710 (Bankr. S.D. Ohio 2003). It is widely recognized that there is a "strong presumption" in favor of granting a discharge. *In re Phouminh,* 339 B.R. 231, 247 (Bankr. D. Colo. 2005)(citing cases).  I will apply the *Lilley* factors to the facts in the instant case.

       *1.    Nature of the debt.*

In her petition, Debtor listed credit card debts totaling over $30,000.00, which is not unusual for individuals seeking relief under chapter 13.  Prior to filing, Debtor had been paying minimum payments on her cards, but had been unable to significantly reduce the balance due. The parties stipulated that prior to filing her petition Debtor made minimum balance payments of $490.00 on five credit card accounts in July 2005. This payment represented 18.5% of Debtor's net income for the month.  Less typical are the debts related to the lawsuit filed by Scott. In schedule "F," Debtor stated that she owed SSF&L $32,896.35 in legal fees on which she was

9

paying $100.00 per month.[4]  She also listed Scott's claim, which was awaiting trial when the petition was filed, as contingent and disputed.

Debtor testified that she never missed a minimum payment on her credit cards or a payment to SSF&L in any month prior to July 2005.  Based on this testimony, Scott asserts that Debtor was successfully managing her finances and did not need to file for bankruptcy protection.  Scott equates this asserted lack of "need" for bankruptcy with evidence of bad faith in the filing of Debtor's petition.  While somewhat logical on its surface, Scott's assertion does not withstand closer scrutiny in the light of the purposes of bankruptcy.  It is axiomatic that the historical purpose of the bankruptcy laws were to provide a fresh start to the "honest but unfortunate debtor." *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)*, In re Bayer,* 210 B.R. 794 (8th Cir. BAP 1997); *In re Muniz,* 320 B.R. 697 (Bankr. D. Colo. 2005).  Debtor's efforts to make the minimum payments on her credit cards and the debt to SSF&L are not indicative of bad faith. Many debtors fail to make any payments on credit card debt in the months before they file and, they are, nonetheless, found eligible for chapter 13 relief.  It would be absurd to find that this Debtor to be ineligible for relief because she attempted to pay her debts prior to filing her petition. Plus, Scott ignores the reality that a significant reduction in principal does not occur when a debtor is only making minimum payments on credit card debt.

2.    *The timing of the petition*

On July 15, 2005, SSF&L was granted leave to withdraw as counsel for Debtor in the

_____

[4]At that rate of payment, even assuming that Debtor would incur no more legal expenses and that additional interest would not accrue on the debt, it would take Debtor over twenty-seven (27) years to pay it in full.

10

defamation case. Twelve days thereafter, Debtor filed her bankruptcy petition. Debtor asserts

that she would not have filed for bankruptcy protection but for the fact that SSF&L was granted

leave to withdraw as counsel only six weeks prior to the trial date. Scott asserts that this

sequence of events is evidence that Debtor filed her petition solely to short-circuit Scott's

lawsuit and to prevent Scott from obtaining a judgment against her. "The filing of bankruptcy

solely to thwart a creditor claim rather than making an honest effort to pay debts is bad faith." *In

re Fleury*, 294 B.R. 1, 8 (Bankr. D. Mass. 2003) (*citing In re Griffith,* 203 B.R. 422 (Bankr. N.D.

Ohio 1996)); *In re Moog*, 159 B.R. 357 (Bankr. S.D. Fla. 1993); *In re Brown,* 94 B.R. 576

(Bankr. D. Minn. 1988). "[T]he bottom line in determining good faith . . . is 'whether the debtor

is attempting to thwart his creditors, or is making an honest effort to repay them to the best of his

ability." *Fleury.* 294 B.R. at 6 (*quoting In re Virden*, 279 B.R. 401 (Bankr. D. Mass. 2002).

Scott relies on the district court opinion in *In re McGovern*, 297 B.R. 650 (S.D. Fla. 2003). In

*McGovern*, the district court held that a debtor's chapter 13 petition was filed in bad faith when

the debt primarily sought to be discharged was a judgment of $80,880.00 in a defamation case,[5]

and the petition was filed on the day before the debtor's compelled appearance at a deposition in

aid of execution on the state court judgment.

     Scott's reliance on *McGovern* is misplaced for several reasons. First, *McGovern*

explicitly rejected the holding in *Lilley* that the nondischargeability of a particular debt under

chapter 7 may be considered for purposes of evaluating whether a chapter 13 petition has been

filed in good faith. This court, unlike the *McGovern* court, is bound by *Lilley.* No negative

---

     [5]Debtor McGovern also sought to discharge approximately $30,000.00 in attorneys fees
related to the defamation action.

inference may be made from Debtor's choice to pursue a "superdischarge" in chapter 13.

Second, the facts in *McGovern* are distinguishable from the instant case in several important

respects. There is a clear distinction to be made between the honesty of purpose of a debtor who

files a bankruptcy for no other reason than to thwart collection of a final, non-appealable

judgment and the intentions of a debtor whose "debt" to a plaintiff/creditor is contingent and

disputed and who no longer can afford legal representation to defend the suit. The testimony in

this case suggests that Debtor's mounting legal fees in defending Scott's suit and the withdrawal

of Debtor's counsel precipitated the filing, not the suit itself. While, as Scott points out, Debtor

had been able to manage her credit card debt and her monthly payment of $100.00 to SSF&L,

the law firm's demand for a judgment note, and the possibility that the firm might immediately

pursue collection on the note, negatively impacted Debtor's already fragile financial situation.

> 3.     *How the debt arose*

As discussed above, there are essentially three kinds of "debts" involved in this case –

the credit card debt, the debt owed to SSF&L and the contingent debt possibly owed to Scott.

Credit card debt is a nearly universal element of consumer bankruptcies. Debts for legal services

are also frequently included in consumer petitions. *See, e.g., In re Ackerman*, 247 BR. 336, 337

(Bank. M.D. Fla. 2000) ("[the discharge ability of attorney fees awarded in connection with a

dissolution of marriage proceeding is a frequently litigated issue.") Scott took pains to point out

that Debtor incurred $5,203.00 in credit card debt in the eight months preceding her petition.

This is not unusual especially when credit is used to pay for normal living expenses. Debtor's

testimony that she used those funds to "make ends meet," but for a few exceptions (including the

purchase of musical equipment for her son) is supported by the evidence. As to the contingent

12

debt owed to Scott, it would be inappropriate for this Court to assume that the allegations in Scott's lawsuit are correct for purposes of evaluating how the debt arose because the case has not yet been tried.

4.    *Debtor's motive in filing the petition*

Debtor was motivated to file the petition by three factors: her excessive credit card debt, her mounting legal bills, and the withdrawal of her attorneys from the defamation case. As referenced above, Scott emphasizes the last of these factors, to the exclusion of the others, and argues that Debtor filed her petition to avoid a large debt to a single creditor, namely Scott. As discussed above, the Court does not agree and is persuaded that Debtor filed her petition to restructure debt that she no longer was able to manage.

5. and 6.    *How the debtor's actions affected creditors, and the debtor's treatment of creditors both before and after the petition was filed.*

The Court sees little distinction between factors 5 and 6 and therefore will discuss them together. Scott does not challenge – indeed she emphasizes – that Debtor's general treatment of creditors before filing her petition was entirely fair. Debtor was current on all her credit card payments and on her payments to SSF&L. Scott presented no evidence regarding Debtor's general treatment of creditors post-petition. Accordingly, I conclude that factors 5 and 6 provide no basis for finding that Debtor's petition was filed in bad faith.

7.    *Whether the debtor has been forthcoming with the bankruptcy court and the creditors.*

The evidence presented is most supportive of Scott's position when evaluating this final *Lilley* factor. Scott adduced evidence of several instances where Debtor was less than forthcoming with this Court. Most troubling was Debtor's failure to report on her SOFA that she

13

had repaid a loan of approximately $1,300.00 to a friend within ninety (90) days of filing her bankruptcy petition. It is difficult to believe Debtor's testimony that she simply forgot about this transfer, given that her financial situation was so precarious at the time. This is a serious omission that received cavalier treatment by Debtor and by her attorney. The Court also cannot comprehend why Debtor did not amend her SOFA after the November hearing, when the matter of this omission first came to light. Despite this disturbing disregard for accuracy of information in Debtor's petition, the Court is not convinced that this omission was part of a plan to deceive or defraud creditors or the Court. Debtor's testified credibly that she did not decide to file a bankruptcy until after SSF&L was permitted to withdraw from the defamation case. Counsel did not withdraw until after the $1,300.00 loan was repaid. Thus, it does not appear that Debtor repaid this particular loan in contemplation of filing bankruptcy.[6]

Accordingly, in weighing the totality of the circumstances as required by *Lilley*, the Court concludes that Scott has failed to carry her burden of proving that Debtor's petition was filed in bad faith. Therefore, the motion to dismiss the case will be denied.

## II.    Objections to the plan

Objections to the plan were filed by creditors Scott and SSF&L. Both creditors argue that Debtor has failed to commit all of her disposable income to her chapter 13 plan. Scott asserts that Debtor has failed to report all of her income, and SSF&L disputes the reasonableness of her claimed expenses. SSF&L also questions why Debtor failed to commit at least 75% of her

---

[6]Scott also correctly identified several other instances in which Debtor did not correctly report information, but the Court did not find these errors to be material. Scott, who appeared *pro se*, focused on factors relevant to denial of a the discharge under § 727(a)(4).

14

disposable income to the plan.[7] Finally, Scott asserts that the plan was not filed in good faith.

Section 1325(b) provides that:

> (1) [i]f the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan – (A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or (B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

11 U.S.C. § 1325(b) (2003) (emphasis added). In other words, if a debtor does not propose to pay all claims in full, he must commit his disposable income for three years to the plan. Even if neither the chapter 13 trustee nor a creditor files an objection, the plan may not be confirmed unless it "has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1325(a)(3); *see Till v. SCS Credit Corp*. 541 U.S. 465, 489 124 S.Ct. 1951, 1967 (2004).

A debtor bears the burden of establishing that the proposed plan meets all of the criteria specified in § 1325(a). *In re Norwood*, 178 BR. at 687; *c.f. In re Hines*, 723 F.2d 333 (3d Cir. 1983) (creditor objecting to plan has burden to show bad faith when chapter 13 trustee states plan meets requirements for confirmation). However, when a creditor files an objection under § 1325(b), he bears the initial burden of producing evidence that the plan fails to meet the statutory requirements. *In re Fricker*, 116 BR. 431, 437 (Bank. E.D. Pa. 1990); *In re Fries*, 68 BR. 676, 685 (Bank. E.D. Pa. 1986); *In re Navarro*, 83 BR. 348, 355 (Bank. E.D. Pa. 1988); *In re Crompton*, 73 BR. 800, 808 (Bank. E.D. Pa. 1987). After the creditor satisfies this initial

---

[7]In this district, if a debtor devotes 75% of his disposable income, as determined by subtracting the debtor's expenses reported on schedule "J" from the net income reported on schedule "I," the Chapter trustee regards the plan as having met the disposable income test of § 1325(b)(1).

Case 1:05-bk-04930-MDF    Doc 95    Filed 09/07/06    Entered 09/08/06 09:36:59    Desc
Main Document      Page 15 of 23

burden, the ultimate burden of proof under § 1325(b)(1) shifts to the debtor. *Fricker*, 116 BR. at 437; *Fries*, 68 BR. at 685; *Crompton*, 73 BR. at 809.

In the instant case, the parties agree that Debtor's chapter 13 plan will not pay all claims in full. Objections to the plan have been filed by two creditors. Therefore, in order to obtain confirmation of her plan, Debtor must agree to commit all of her projected disposable income to the plan for three years. When Debtor's expenses, as listed on schedule "J," are subtracted from her income as reported on schedule "I," Debtor reports disposable income of $418.00 per month. But her plan proposes to pay only $300.00 per month or 72% of her disposable income. While the chapter 13 trustee has not objected to Debtor's plan, the Court cannot defer to the trustee's guidelines and must analyze whether the evidence supports a finding that Debtor has failed to devote all her disposable income to the plan. For the reasons set forth below, the objections of Scott and SSF&L (the "Objectors") to Debtor's plan will be sustained.

Scott also objected to the plan as not having been filed in good faith. Because I have determined that Debtor has failed to commit all her disposable income to the proposed plan, it cannot be confirmed under § 1325(b)(1). However if I find that Scott's contention that Debtor's plan was not filed in good faith is well founded, it would be a futile act for Debtor to amend her plan without also addressing this objection as well. Accordingly, I also will examine whether the plan has been proposed in bad faith.

"[C]ourts have long struggled with the appropriate parameters for the requisite inquiry into the debtor's motive and intentions in proposing a chapter 13 plan." *In re March* 83 BR. 270, 273 (Bank. E.D. Pa. 1988) (quoted in *In re Goddard*, 212 BR. at 239). The inquiry into whether a chapter 13 plan has been proposed in good faith focuses on the following factors:

16

(1) whether the debtor has stated his debts and expenses accurately; (2) whether he has made any fraudulent misrepresentations to mislead the bankruptcy court; or (3) whether he has unfairly manipulated the Bankruptcy Code. . . . The inquiry, however, still has at its heart the determination of whether under the circumstances of the entire case there has been an abuse [of the chapter 13 process in the proposed plan].

*In re Goddard*, 212 BR. at 240 (internal citations omitted). In conducting this inquiry, a bankruptcy court must avoid moralizing about a debtor's prepetition conduct and acknowledge that chapter 13 contemplates that debtors may obtain a discharge of debts that arise from inappropriate conduct. Further, the Court of Appeals for the Third Circuit has determined that proposing a plan that seeks to discharge a debt that would be non-dischargeable in a chapter 7 case does not constitute bad faith. *In re Lilley*, 91 F.3d at 496, fn. 2. *See also In re Andreacchio*, 2004 WL 2495409, *3 (Bank. E.D. Pa. 2004) (No finding of bad faith in chapter 13 plan that proposed to discharge judgment that creditor believed would be non-dischargeable in chapter 7). But the debtor must be honest and in need of a fresh start. If the petition is filed or the plan is proposed to hinder or delay creditors, the purpose is improper and contrary to the spirit of the Bankruptcy Code. *In re Norwood,* 178 BR. 683, 688 (Bank. E.D. Pa 1995).

Scott's objection focuses on whether Debtor accurately reported her income on schedule "I." As demonstrated in footnote 2 above, the monthly net income figure provided by Debtor on schedule "I" is greater than the bi-monthly amount indicated on her pay stub multiplied by 26 and then divided by 12. Debtor conceded that she had under-reported her annual net income by "several thousand dollars" on her SOFA. This admission, however, does not establish that Debtor was attempting to disguise her actual earnings because on schedule "I" she overstated her income. Debtor's failure to accurately report her income is not acceptable, but the sloppy preparation of schedules in this case does not rise to the level of bad faith. Debtor will be

17

required, however, to submit an amended schedule "I" that correctly states her salary for the 2006/2007 school year and that includes all amounts that she expects to receive from extra duty contracts as well as any other source from September 1, 2006 through August 31, 2007.

In support of her claim that Debtor's petition was not filed in good faith and that the case should be dismissed, Scott also attempted to adduce evidence from Debtor to show that she had made luxury purchases during the seven months prior to filing her petition. Scott did establish that Debtor used credit cards for approximately $5,000.00 in purchases during the period, while making only minimum payments on the purchases each month. Approximately $1375.00 of these purchases were made in December 2004, and $1,100.00 was spent on musical equipment for her son in April 2005. Most of the other charges made during the period were less than $200.00 and were made at department stores, grocery stores and her hair salon. Debtor made some purchases that were not necessary and demonstrated a lack of good judgment, but the Court does not find that these purchases establish that under the circumstances of the entire case there has been an abuse of the bankruptcy process.

SSF&L does not question Debtor's good faith, but argues that Debtor has failed to commit all of her disposable income to her plan The law firm's case focused on the reasonableness of Debtor's expenses, especially her monthly expenses for telephone service ($150.00 per month for both a "land line" and a package deal for cell phones for herself and her son), for food ($500.00), and for high speed internet service ($88.00). SSF&L also questioned the necessity of Debtor providing her adult son with a monthly allowance of $100.00. The Bankruptcy Code "does not provide explicit guidance regarding the appropriate degree of scrutiny a court should apply when determining whether particular expenses are in fact

18

'reasonably necessary to be expended for . . . maintenance and support.'" *Sarasota, Inc. v. Weaver*, 2004 WL 2514290, *2 (E.D. Pa.) (citing *In re Devine,* 1998 WL 386380, at *6 (Bank. E.D. Pa.). However, "[i]t is not the function of [the Bankruptcy] Court to dictate choices of life style or to micro-manage the budgeting of family expenses." *In re Raimondo*, 183 BR. 677, 681 (Bank. W.D. N.Y. 1995). However, the burden rested on Debtor to demonstrate that her expenses were reasonable once they were challenged by SSF&L. *See In re Fries*, 68 BR. at 684-685.

> Courts apply § 1325(b) to allow debtors to maintain a reasonable lifestyle while simultaneously insuring they make a serious effort to pay creditors by eliminating unnecessary and unreasonable expenses. . . . Debtors are also allowed some latitude regarding discretionary spending for items such as recreation, clubs, entertainment, newspapers, charitable contributions and other expenses. . . . The Court lumps together all expenses projected by the debtor which are somewhat more discretionary in nature, and any excessive amounts in the relatively nondiscretionary line items such as food, utilities, housing, and health expenses, to quantify a sum which constitutes disposable income.

*In re Zuehlke,* 298 BR. 610, (Bank. N.D. Iowa  2003)(citations omitted).

In the instant case, the Court agrees that Debtor's telephone expenses could be trimmed, her monthly food expense seems high for what is, for most of the year, a single-person household, and the allowance for her son is unreasonable because he is an adult and works part-time.[8]  Debtor should be able to reduce her expenses by approximately $200.00 a month by

---

[8]The Bankruptcy Code does not define the term "dependent" or provide any guidance in determining who is a dependent. . . .  *In re Gill*, 326 BR. 611, 633 (Bank. E.D. Va. 2005).  Many courts have held that support payments to an emancipated child are not reasonable and necessary expenses.  *Id.* at 631 - 633 (collecting cases).  Other courts have held that support payments to an adult child who is attending college may be considered "necessary" to the extent that they are "reasonable." *In re King*, 308 BR. 522, 533 (Bank. D. Kan. 2004) (Reasonable expenses incurred by a debtor to educate his or her children are "justified on the need to equip those children with the fundamental skills that are 'reasonably necessary' for future employment. . . .") (citations omitted.)

19

reducing or eliminating these objectionable expenses. Debtor also must recalculate her income because she failed to consider the two additional extra duty contracts when she completed schedule "I." Further, once Debtor has adequately budgeted for contingencies, she must commit 100% of her disposable income to the plan. To assist her in formulating an amended plan, Debtor will be required to review her current income and expenses and file amended schedules "I" and "J" that fully and accurately report this information. Amended schedule "I" should include her salary for the 2006/2007 school year and all amounts that she expects to receive from extra duty contracts as well as any other source from September 1, 2006 through August 31, 2007. Amended schedule "J" should include all current expenses, as well as provide for contingencies that inevitably will arise during the year. While I do find that Debtor has failed to commit all of her disposable income as required by § 1325(a)(1), I find no abuse of the provisions of the Bankruptcy Code so as to establish bad faith. Thus, there is no insurmountable impediment to confirmation of a plan in this case if Debtor amends her plan consistent with this Opinion.

## III. The fee application.

The Bankruptcy Code provides, in pertinent part, as follows:

  (a)(1) After notice to the parties in interest . . ., the court may award to a trustee, an examiner, a professional person employed under section 327 or 1103 --
    (A) reasonable compensation for actual, necessary services rendered by the . . . attorney . . .; and
    (B) reimbursement for actual, necessary expenses.
              * * *
  (3)(A) In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –
    (A) the time spent on such services;
    (B)  the rates charged for such services;
    (C)  whether the services were necessary to the administration of, *or*

20

> *beneficial at the time at which the service was rendered toward the
> completion of*, a case under this title. . . .

11 U.S.C. § 330 (italics added).

"It is well established that 'those seeking compensation for professional services rendered . . . on behalf of a debtor's estate bear the burden of proof in establishing the reasonable value of their services.'" *In re White*, 171 BR. 554, 555 (S.D. Miss. 1994) (citations omitted). A bankruptcy court has an independent duty to review any fee application, even in the absence of an objection from an interested party. *In re Busy Beaver Building Centers, Inc.,* 19 F.3d 833, 841 (3rd Cir. 1994). "Broad discretion is vested in the court to conduct such review." *In re Evans,* 281 BR. 552, 554 (Bank. M.D. Pa. 2001) (citing *In re Lan Assocs., XI, L.P.,* 192 F.3d 109, 122-123 (3d Cir. 1999)). However, in setting an attorney's fee, the Third Circuit has suggested that a bankruptcy court should not become "enmeshed in a meticulous analysis of every detailed facet of the professional representation." *Busy Beaver.* 19 F.3d at 844-45 (citing *Lindy Bros. Builders, Inc. v. American Radiator & Std. Sanitary Corp.,* 540 F.2d 102, 116 (3d Cir. 1976)). "Because its time is precious, the reviewing court need only correct reasonably discernible abuses, not pin down to the nearest dollar the precise fee to which the professional is ideally entitled." *Busy Beaver,* 19 F.3d at 845.

A court's "overriding obligation" when examining a professional's fee application is to "'protect the estate, lest overreaching attorneys or other professionals drain it of wealth which by right should inure to the benefit of unsecured creditors.'" *Busy Beaver,* 19 F.3d at 844. *See also In re Truong*, 259 BR. 264, 267 (Bank. D. N.J. 2001) ("bottom line consideration" should be whether fee is fair; both to professional whose fee is sought, as well as to debtor and creditors). In awarding fees, a bankruptcy court is interested in not only adequately compensating attorneys

Case 1:05-bk-04930-MDF    Doc 95    Filed 09/07/06    Entered 09/08/06 09:36:59    Desc
Main Document      Page 21 of 23

in order to encourage competent counsel to choose bankruptcy as an area to practice, "but in insuring that the costs of administration do not consume all of the assets that would have been available to creditors." *In re Columbia Plastics, Inc*., 251 BR. 580 (Bank. W.D. Wash. 2000). In making a fee determination, the court must take into consideration whether the professional exercised "reasonable billing judgment." *In re Grosswiler Dairy, Inc.*, 257 BR. 523, 528 (Bank. D. Mont. 2000); *In re Mednet*, 251 BR. 103 (9th Cir. BAP 2000). "The court's responsibility to protect the estate is especially important in chapter 13 cases where there is little motivation for a debtor, or creditors, to object to a particular fee allowance." *In re Szymczak,* 246 BR. 774, 778 (Bank. D. N.J. 2000).

To determine the amount of reasonable compensation under 11 U.S.C. §330, a bankruptcy court should consider "the nature, the extent and the value of such services, taking into account all relevant factors," including but not limited to the amount of time spent, whether the amount of time spent is reasonable in light of the "complexity, importance and nature" of the case, the rates being charged by the movant, the rates charged for similar services by other practitioners, and the necessity and benefit of the services to the estate. 11 U.S.C. §330(a)(3)(A) – (E). Further, in a chapter 13 case, reasonable compensation may be allowed for representing the interests of the debtor in connection with the case. 11 U.S.C. §330(a)(4).

In her objection to the fees requested by Travis, Scott challenges many of the services performed on the basis that such services cannot yet be said to have provided a benefit to the estate because they are related to litigation that has not yet been completed. However, the Code clearly does not require counsel for a party to prevail in order to be compensated by the estate. *In re Flight Transportation Corp. Securities Litigation,* 874 F2d 576 (8th Cir. 1989) (citing *In re*

22

*Revere Copper & Brass, Inc.,* 60 BR. 892 (Bank. S.D. N.Y. 1986)).  In bankruptcy litigation, a

loss on the merits does not necessitate a finding that it was inappropriate for a debtor's counsel

to pursue or defend the matter.  Further, she finds some of the tasks for which Travis is seeking

compensation to be unnecessary.  I disagree. The Court has closely examined Travis's fee

application and has found it to be reasonable and necessary considering the nature, extent and

value of the services.  Accordingly, Scott's objection to Travis's fee application will be

overruled, and the fee application will be approved.

An appropriate Order regarding all of the above-discussed motions and objections will be

entered.

BY THE COURT,

Bankruptcy Judge

Date:   September 7, 2006

*This document is electronically signed and filed on the same date.*

23